John B. Daly, Plaintiff-Appellant, v. Sam Vinci, et al., Copartners d/b/a Nick Vinci and Son, Defendants-Appellees.

Gen. No. 49,336.

First District, First Division.

July 27, 1964.

Paul Denvir and Daniel Nagle, of Chicago, for appellant.

Jacobs & McKenna, of Chicago (Royce Glenn Rowe and Barry L. Kroll, of counsel), for appellees.

MR. JUSTICE BURMAN delivered the opinion of the court.

The plaintiff appeals from a jury verdict of $500 returned in an action for personal injuries. The plaintiff's theory of the case as stated in his brief is that:

> The jury, having found the defendant guilty, was under a duty to assess damages in accordance with the evidence and instructions of the court. An award of Five Hundred Dollars ($500.00), where there have been proved expenses for hospitalization, doctor bills, physiotherapy and drugs of $1,365.73, is grossly inadequate and ignores the evidence as to the nature and extent of the injury and loss of income. The plaintiff is entitled to a new trial as to damages only, or in the alternative to a new trial.

It is defendants' theory that the assessment of damages by the jury, a matter wholly within their province, was not incorrect as both the nature and extent of the plaintiff's injuries and damages proximately flowing therefrom were controverted questions of fact; that the jury was amply justified in assessing the damages as they did; and that the trial court properly denied plaintiff's post-trial motion.

██ The applicable law as stated in 15 ILP Damages, Sec 162 reads:

> The courts are reluctant to interfere with the discretion of the jury as to the amount of damages to be awarded, and ordinarily will not overturn the jury's finding for inadequacy of its award unless the award is palpably inadequate or against the manifest weight of the evidence

374

. . . However, an award cannot be upheld where serious damages are sustained and a small or a nominal amount is awarded, especially where the injuries are permanent; or where the plaintiff has been injured and has also incurred expenses as a result of the injuries, and an award is made for less than the amount of the expenses.

In a case which depends so much upon a consideration by this court of the facts, it will be necessary to set out a lengthy summary of the evidence adduced at trial. The trial record is taken up almost entirely with plaintiff's case. The defendants produced only one witness, a court reporter, whose testimony was directed solely at impeaching one of plaintiff's medical witnesses.

John B. Daly, the plaintiff, called as a witness on his own behalf, testified that he is an employee of the Chicago Transit Authority and that prior to the occurrence, which is the subject of this suit, he was employed as a special legal investigator for the C.T.A. His story as to the collision was simply that on January 14, 1958, he was struck from the rear (while his car was standing still behind a stopped truck) by the station wagon being driven by one of the defendants, Sam Vinci. He was pushed forward and backward by the force of the collision, but didn't feel any physical pain at the moment of impact.

A summary of plaintiff's testimony as to his injury, is as follows. On getting out of the automobile he felt a pain in the back of his neck. He remained at the scene of the occurrence about fifteen or twenty minutes and after he had driven his car about four blocks he said, "I noticed that the pain was radiating up to my head and shoulders and my arms were getting heavy and weak." After several hours at home he called Dr. Rocco Fazio, his family physician who examined him that afternoon in his office and

prescribed some pills and heat. He remained in bed most of the time until January 20th, when he went to his office for about three hours. At the direction of Dr. Fazio he was in the St. Bernard's Hospital from January 22nd to February 1st, where he was put in traction and given pills. On February 7, 1958, Dr. Charles E. Corcoran, to whom he was referred by Dr. Fazio, gave him a neurological examination. He remained home from February 1st to March 3rd, during which time he was in traction. He said he went back to work on March 3rd and felt "pretty good," but "then every day it seemed to be getting worse." On March 26th he said his "neck was rigid and the pain was real severe." He went to Dr. Stephen Mosny, the company doctor, who examined him and advised him to see Dr. Claude Lambert, an orthopedic surgeon. Dr. Lambert prescribed a "collar" which held his head rigid and advised him to take diathermy treatments." He wore the collar at home continuously for about a month and during that time discontinued taking traction. He took numerous physiotherapy treatments and applied heat pads and was off work from March 27th to June 23rd. When he returned to work on the latter date he was given an office assignment instead of outside work and was permitted to work on a shorter day schedule. His medical expenses are itemized as follows:

| | |
|---|---:|
| St. Bernard's Hospital | $ 211.50 |
| Dr. Rocco Fazio | 365.00 |
| Dr. Claude Lambert | 200.00 |
| Louis Pelzman (physiotherapist) | 250.00 |
| Prescriptions, medicine etc. | 339.23 |
| | $1,365.73 |

Daly further testified that while he was working for the C.T.A. he was also employed by Frank J.

Foley and Company on weekends. His average earnings in 1956 and 1957 on this job were more than $2,400 each year. After March 23, 1958, he never returned to Foley's.

The plaintiff produced four medical witnesses on his behalf. We will not set out the treatments and medications prescribed by the various doctors, but will limit ourselves to a review of their diagnostic findings. The first doctor to see the plaintiff was his family physician, Dr. Rocco Fazio, whose testimony was introduced by way of deposition. Dr. Fazio testified that he examined the patient on the day of the accident and found objective marked limitation on motion of the head and neck, particularly in rotation flexation and extension. There were signs of discoloration under the skin and trigger-point tenderness in both the left and right side of the neck muscles. Subjectively the patient complained of pain in the neck and inability to extend his head. On the date of the injury the doctor diagnosed the patient's condition as a "traumatic subluxation (strain) of the cervical spine, traumatic cervical myositis, with hematoma into the muscle tissue." The patient's symptoms, both objective and subjective, were in the doctor's opinion a result of injuries sustained on January 14, 1958. Dr. Fazio continued to treat the plaintiff and on September 25th, he modified his diagnosis to that of a whiplash injury with hematoma of the neck muscles, peripheral neuritis and aggravation of cervical arthritis, all caused or aggravated by the accident. He said that,

> "In my opinion, any lesion which is related to the central nervous system, as in this case, seems to have a tendency to get progressively worse toward the end of the day. As the tension

377

mounts, physical activity mounts, the pain in the nerve area becomes progressively worse."

and

"Based on my observation and care, I believe this disability is going to be permanent."

Dr. Fazio referred the plaintiff to Dr. Corcoran, a neurosurgeon, who saw plaintiff three weeks after the accident. He diagnosed the injury, which in his opinion was the result of the instant accident, as a contusion of the cervical muscles of the spine or a whiplash injury. He related that, "We can call it a whiplash injury, or a contusion of the cervical spine or a traumatic cervical neuritis or an Orphan Annie injury or anything. It all amounts to the fact that this mechanism which nature has given to us to give us all the freedom that is necessary in our neck can be knocked awry by trauma."

The plaintiff, as an employee of the C.T.A. consulted Dr. Stephen Mosny, C.T.A. Medical Director, on January 22, 1958. Dr. Mosny diagnosed the injury as a whiplash injury of the neck, strain of the lumbosacral region of the back, and aggravation of chronic arthritis of the spine. The doctor also stated that the injury was a result of the involved automobile collision and that the disability was permanent. Dr. Mosny said that his diagnosis was based not only upon the subject complaints of the plaintiff, but also upon certain objective findings in his examination.

Dr. Mosny referred the patient to Dr. Claude N. Lambert, an orthopedic surgeon. Dr. Lambert testified that he is a professor of orthopedic surgery at the University of Illinois College of Medicine and that he is in charge of one-half of the orthopedic inpatients in the hospital associated with the medical school. Dr. Lambert first saw the plaintiff on March 25, 1958. From an examination of the plaintiff's head,

neck and shoulders, he found a limitation of neck motions. Based upon an examination of X-rays, Dr. Lambert felt that there was an "irregular curve on forward flexation" which indicated muscle spasm. The condition was diagnosed by Lambert in the same terms which had been used by Dr. Fazio, the first physician to examine the plaintiff, namely, as an acute cervical spine sprain. Dr. Lambert also said that condition might be described as a "contusion of the muscles of the cervical spine." This it will be recalled was the diagnosis arrived at by Dr. Corcoran. Dr. Lambert explained the injury as follows:

> The X-rays show no fracture or no dislocation so it must be a sprain, but sometimes a sprain can be just as severe as a fracture and sometimes even worse. And I think that the same situation holds true in the cervical spine. So we come back that this is an acute cervical spine sprain and the symptoms that he has I feel are quite compatible with this. He made a recovery from the acute phase but then something still held on. He still had some muscle spasm and pain and headaches and the objective findings were a persistent and rather consistent restriction of certain phases of neck motions. He did not regain at any time that I saw him a complete full range of cervical spine motion. He just didn't get it back. I think something that has gone this long would have to be a certain degree of permanency.

The doctor testified that his diagnosis was based in part upon his own manipulation of the patient's head and neck. He explained that:

> There are some reflexes within the control of the patient and some completely involuntary. The reflexes or the action of the neck can be both. It could not be voluntary upon the attempted

379

movement of the patient's head by a doctor. I think in the hands of a trained observer, which I am, I can differentiate between a voluntary restriction and a reflex restriction.

In summary, the record shows that between the date of the accident and the date of trial, Dr. Fazio saw the plaintiff on 58 occasions as a result of his neck injuries. Dr. Corcoran was called in as a diagnostic specialist and examined the plaintiff only once. Dr. Mosny, the Medical Director of the C.T.A. based his opinions upon 31 examinations, and Dr. Lambert treated the plaintiff 28 times. In addition to the four doctors whose services we have set out, the plaintiff was referred to a physiotherapist from whom he was to take approximately 50 treatments during the ensuing years. Thus we are shown a total of 165 visits and treatments with doctors or therapists plus a period of nine days, shortly after the accident, spent in St. Bernard's Hospital.

The only witness offered by defendants was Ronald E. Knight, a court reporter, who testified that in a deposition taken by Dr. Rocco Fazio, the doctor had said that he did not consider plaintiff's injuries permanent. This contradicted the opinion expressed by Dr. Fazio in the later deposition which was read into the trial record. No copy of the earlier deposition was introduced into evidence and it must be noted that Dr. Fazio's testimony as to the permanency of the injury in the later deposition was clear and without hesitancy.

The defendants contend that the testimony of the doctors presented by the plaintiff was so inconsistent and contradictory that although no medical experts were produced in rebuttal, the seeds of disbelief there sown were sufficient to sustain the low award returned. Defendants maintain that once disbelief has been created the jurors are the sole judges

of the credibility of the witnesses and their verdict, however low, must be affirmed. Kaptain v. Overgaard, 19 Ill App2d 483, 154 NE2d 105; Jeffrey v. Chicago Transit Authority, 37 Ill App2d 327, 185 NE 2d 384. The principle which defendants put forward is undoubtedly true. We, however, are unable to find the circumstances of doubt and contradiction which would call forth its application. We feel that the medical testimony presented by plaintiff and unrebutted in any major way by defendants, presents a consistent and reasonable picture of the plaintiff's injuries. All of the doctors who examined the plaintiff agree that he has suffered a serious injury. Three of the doctors, although using technical terms, admit that the injury may be characterized by the term "whip lash." The fourth doctor, although not using the term "whip lash," describes what is a "whip lash" injury. Three of the four doctors testified that the plaintiff's condition was permanent. The fourth doctor could hardly be expected to have an opinion as to permanency since he examined the plaintiff on only one occasion a short period after the accident. Three of the doctors were asked if the attacks of neck pains and other injuries were a result of the January 14, 1958 accident. Despite the fact that there was some evidence in the record of prior neck and back trouble and a fall subsequent to the accident, the doctors all answered the question in the affirmative.

Defendants contend that the doctors found differing symptoms and ascribe this to the feigning of injuries by the plaintiff. It is true that plaintiff's symptoms differed somewhat in the lengthy period during which the various examinations took place. The record, however, indicates that the type of injury suffered by the plaintiff is one which can vary in intensity and location of pain. We feel that this fact is a sufficient explanation of the changing complaints registered by the plaintiff. In addition, the picture

here is not one of a plaintiff consulting doctor after doctor with a view toward building a large volume of medical bills. The record indicates that the plaintiff initially consulted only his family and company physicians and that these doctors referred him to specialists and therapists.

Our view in this matter is also influenced by another factor in the case. The defendants cite Giddings v. Wyman, 32 Ill App2d 220, 177 NE2d 641 for the proposition that a jury is justified in finding that injuries were minimal where doctors treated the patient solely in response to subjective complaints. That is not the case in the suit at bar. Dr. Fazio, Dr. Mosny and Dr. Lambert all testified as to the difference between subjective findings based upon the patient's complaints and objective findings based upon the physician's own observations. They affirmed that their diagnoses and treatments were based not only upon plaintiff's complaints, but upon their independent findings. It would thus have been impossible for the plaintiff to have influenced to any great extent the medical conclusions reached by the various doctors. As to the issue of whether the plaintiff did nevertheless attempt to feign injury, we have the testimony of Dr. Lambert who was asked:

Mr. Denvir: What is a malingerer, Doctor?
The Witness: A malingerer is one who is feigning illness for monetary gain.
Mr. Denvir: Would you consider Mr. Daly a malingerer?
The Witness: No.

This statement of Dr. Lambert as to the honesty of plaintiff's claims is particularly important since we believe from a reading of the entire record that a misunderstanding as to other portions of his testimony contributed greatly to the low damage award made by the jury. It would be well to set out a por-

tion of Lambert's testimony and the sequence in which his remark as to "malingering" was elicited. Dr. Lambert while testifying on cross-examination stated that in a letter written on August 23, 1960, 2½ years after the accident, he had said that the plaintiff's subjective complaints far outweighed his objective findings and that "I certainly believe he will get markedly better if and as when his lawsuit regarding this accident could be settled." He also said that "It is not uncommon to have after a long drawn out affair a change in the picture—whereas originally we would see a patient with a 90% anatomical disability, and a 10% functional. With time, this picture can shift and come on the reverse . . . a patient begins to worry; a patient begins to feel tense . . . they (worry, tension, apprehension) can aggravate whatever is pre-existing there (in the neck)."

On redirect Dr. Lambert was asked to explain his rather surprising statement that the patient would get better if the case were settled. He said, "I think not only this patient, but any patient that has a long drawn out episode, they have a lawsuit pending. Over my years of experience I found that most people feel better generally when they get this over with, and I think Mr. Daly is no exception." It was at this point that the doctor was allowed to testify, over defendants' objections, as to his definition of a "malingerer" and his opinion that the plaintiff was not one who would feign illness for monetary gain.

Counsel for the defendants makes extensive use of Dr. Lambert's characterization of the plaintiff's later complaints, both in his argument before the jury, and in his brief and argument before this Court. He sees in the doctor's statements not candor as to the effect of mental strain upon physical injuries, but rather the suggestion of false representations of a most insidious kind. If the jury was equally led astray by this reasoning it would have led them to an erroneous

conclusion as to the extent of the injuries for which the plaintiff was entitled to be compensated. We feel that the statements of Dr. Lambert on redirect examination should be sufficient to make clear that if the plaintiff's motives are to be impeached they must be impeached elsewhere.

The defendants then argue that the credibility of the plaintiff was impeached by the introduction of certain evidence which sharply conflicted with plaintiff's testimony. Daly testified that immediately after the accident on January 14, he went home and called Dr. Fazio. After visiting Dr. Fazio that afternoon he again went home and remained there, in bed, until January 20, when he went to his office for two or three hours. Thereafter, he stayed home until he entered the hospital on January 22nd, and did not return to work until March 3rd. The evidence showed that in addition to his work with the C.T.A. the plaintiff worked part-time as an insurance adjuster for the F. J. Foley Co. Plaintiff's supervisor at Foley testified in his behalf and on cross-examination revealed that company records showed Daly as working nine and one-half hours and driving eighty-nine miles on January 18th and 19th, and working fifteen additional hours prior to March 4th. This conflict would appear to indicate that either the plaintiff was attempting to take advantage of his employer, or that his injuries were not as serious, at that date, as he had indicated. We agree with the defendants that this conflict acts as an impeachment of the plaintiff's testimony. This discrepancy, however, is minor, in terms of any analysis of plaintiff's provable injuries. We fail to see how it can impeach the uncontradicted testimony of four medical experts. The plaintiff might have had some propensity for exaggerating his injuries, but we have already seen that the doctors based their diagnoses upon factors which even the

384

most "zealous plaintiff" could not influence in any way.

It might be well to consider the relation of this case to the decision cited to us by plaintiff, of Jeffrey v. Chicago Transit Authority, 37 Ill App2d 327, 185 NE 2d 384. That case involved a rear end collision by a C.T.A. bus which struck plaintiffs' car. The jury returned a verdict for the plaintiffs with no damages. The Appellate Court in affirming the jury verdict held that nominal damages need not be awarded in negligence actions where actual damages have not been proven. In viewing the evidence the court stated that plaintiff's testimony was self-contradictory, and in some material matters impeached. The jury there could have found plaintiff's testimony unworthy of belief and their injuries feigned, and testimony of the doctor, who allegedly corroborated plaintiffs, was such that the jury could have given it little credence. The doctor's bill, amounting to $565, which in part covered anticipated services, was sent to the lawyer and not to plaintiffs. The Jeffrey case is easily distinguishable from the case at bar since there, the trial court jury found, and the Appellate Court agreed, that no actual damages were proven. As we have pointed out at some length, we do not feel that such is the conclusion reached here after a review of the evidence. Nor do we feel persuaded by the other cases upon which defendants rely.

In the case of Kaptain v. Overgaard, 19 Ill App2d 483, 154 NE2d 105, in which a low verdict for plaintiff was affirmed, there was a serious conflict in testimony between plaintiff's and defendant's medical witnesses. In McSee v. Chicago Motor Coach Co., 342 Ill App 238, 96 NE2d 381 the court in refusing to overturn a jury verdict for $1,000 over "specials" said:

385

In substantially all the cases cited and relied upon by plaintiff where judgments were reversed because of inadequacy of damages, the medical evidence of injury was undisputed, and the amounts awarded by the jury were patently inadequate. In the case at bar the evidence relating to plaintiff's injury and its cases were in many of its aspects irreconcilable, especially in view of the evidence relating to prior injuries.

The case of Noel v. Hale, 33 Ill App2d 286, 177 NE 2d 886 is also distinguishable from the case at bar; the most striking difference being that there, no suggestion was made from the evidence that the plaintiff had sustained permanent injuries. In addition, the plaintiff in Noel sought to increase an award amounting to twice his special damages for an injury from which he had recovered at the time of trial. In Matheis v. Aharonian, 324 Ill App 82, 57 NE2d 140 the court reversed an order setting aside a jury verdict for defendant and ordering a new trial. The Appellate Court reviewed the evidence and found that the jury was justified in bringing in a verdict for defendant, thus never reaching the issue of inadequacy of damages.

Finally, it might be well to say that this court is aware of the evils of the feigned, exaggerated or manufactured personal injury case. We consider it our duty to remain diligent to this danger and to affirm verdicts, however low, which are sustained by the evidence or rather the absence of evidence. We feel that in a personal injury case it is within the exclusive province of the jury to assess damages where there is a genuine conflict in the evidence. There is, however, no reason, either in law or in policy for affirming a verdict grossly below even the provable special damages, particularly where the plaintiff's permanent injuries have been testified to by uncon-

tradicted medical experts whose diagnoses and treatments are based upon both subjective and objective factors. It matters little whether the jury award was given as a result of a misunderstanding of the reconcilable terms used by the doctors, mistrust of the plaintiff himself or confusion as to the candid trust of Dr. Lambert's testimony, the result in any case was the jury's disregard of the factors which manifestly point to a substantial award for the plaintiff.

The accident occurred when the front of defendant's car struck the rear of plaintiff's standing automobile. One of the defendants, Sam Vinci, the driver of the car, who was called as a witness by plaintiff under Sec 60 of the Civil Practice Act, admitted that when he struck plaintiff's car he did not see it in time to stop. We believe that the verdict on the question of liability was amply supported by the evidence.

We have previously pointed out plaintiff's expenses and his loss of income. We feel that the award of $500 bears no relation to these damages or to the injuries suffered by the plaintiff and are clearly inadequate and manifestly against the weight of the evidence.

In our opinion the trial court erred in not sustaining plaintiff's post trial motion for a new trial on the issue of damages. For the reasons above set forth, we hold that the plaintiff is entitled to a new trial solely on the issue of damages. Paul Harris Furniture Co. v. Morse, 10 Ill2d 28, 139 NE2d 275.

Reversed and remanded with directions that a new trial be held on the issue of damages alone.

MURPHY, P. J. and KLUCZYNSKI, J., concur.