GUSTAV H. BECKMEYER II *et al.*, Plaintiffs, v. THEODORE F. ALCALA, Defendant-Appellee (Thomas J. Lane *et al.*, Plaintiffs-Appellants).

Fifth District   No. 5—84—0183

Opinion filed July 17, 1985.—Rehearing denied August 13, 1985.

James B. Wham, of Wham & Wham, of Centralia, for appellants Thomas J. Lane and Carol Lutz.

Walker & Williams, P.C., of Belleville (John B. Gunn and Anthony L. Martin, of counsel), for appellee.

JUSTICE KARNS delivered the opinion of the court:

Plaintiffs, Thomas J. Lane and Carol Lutz, appeal from the denial of their motions for a new trial limited to the issue of the adequacy of the damages awarded by the jury in the circuit court of St. Clair County because of injuries received in an automobile accident. Plaintiff Gustav H. Beckmeyer, who received a similar verdict, has not joined in this appeal.

On November 11, 1980, an automobile driven by defendant, Theodore F. Alcala, struck from behind the automobile in which plaintiffs were riding as Lane was preparing to make a left turn across a single lane into a service station. Alcala's left front end struck the right rear end of Lane's automobile without warning. The impact caused Lane's vehicle to be pushed across the oncoming lane and to come to rest near the entrance to the station. Lane and Beckmeyer testified that the impact also caused the front seat to be thrown back, thereby necessitating later replacement of the seat frame and stationary bar. Other evidence of damage to the vehicles was described by the parties. The only immediate complaint of injury resulting from the collision came from Lutz, who was seated in the back and hit her head against the rear window as she was thrown back. Alcala also complained of immediate injury, but this resulted when Lutz walked over to him and punched him in the nose. Illinois State Trooper Paul Stygar issued Alcala a citation for failure to reduce speed to avoid an accident. Stygar testified, "It was a fairly routine-type accident in that I didn't have to summons [sic] a tow or ambulance, this sort of thing." After Stygar completed his investigation, plaintiffs returned to their car and resumed their trip to Nashville, Illinois.

During the return trip Lane experienced pain and stiffness in his neck. Lutz continued to have pain in her head. Upon their arrival in Nashville they went directly to Washington County Hospital emergency room, where they were examined by Dr. Thomas J. Coy. Dr. Coy ordered X rays for Lane and Lutz.

With regard to Lutz, Dr. Coy testified on deposition that she exhibited spasms on her cervicodorsal neck muscles. He observed a slight swelling on the top of her head. His review of her X rays also disclosed some straightening in an otherwise normal cervicodorsal lordotic curve, indicating an objective sign of injury to that area. He prescribed a muscle relaxant and advised limitation of activity, with instructions to report to his office in three days.

With regard to Lane, Dr. Coy testified by deposition that he complained of neck stiffness, headache and a cracking sensation in the left clavicular area. His examination revealed muscle spasms, tenderness and soreness in his cervicodorsal area. His X rays disclosed straightening of the normal lordotic curve and slight anterior wedging of the C-5 vertebra. The latter condition Dr. Coy attributed to a pre-existing problem. Dr. Coy prescribed an analgesic, a muscle relaxant and a cervical collar. He advised limited activity and instructed Lane to report to his office by the end of the week.

Lutz returned three days later, on November 14, 1980, and complained chiefly of discomfort in her upper back. Dr. Coy found that she had some paravertebral myospasm in the upper dorsal spine or just below the neck. He prescribed additional muscle relaxants and an analgesic, gave her units of adrenocorticotrophic hormone, and ordered physical therapy. Dr. Coy advised another visit within the week. Lutz returned one month later, December 15, complaining of pain in the upper dorsal spine. No complaint was recorded regarding the cervicodorsal area. Yet, Dr. Coy prescribed home cervicodorsal traction for relief of muscle spasms, and he administered some traction in the office. Lutz's next visit was on January 30, 1981, wherein she complained again of upper dorsal pain. By examination, Dr. Coy found that the muscle spasms persisted, so he continued her on muscle relaxants and pain relievers.

Lane also returned to Dr. Coy on November 14. He complained of stiffness and muscle pain, mostly in his neck but also in his upper and middle back. Dr. Coy diagnosed cervicodorsal and trapezoid muscle spasms. He prescribed adrenocorticotrophic hormone, a pain reliever and physical therapy. Lane returned as did Lutz on December 15, complaining of mid-dorsal back pain and shoulder pain. Dr. Coy's examination showed muscle spasm and tenderness. Lane's pain medication was refilled. Again Lane returned on January 30, 1981, complaining of pain in the dorsal spine. Dr. Coy prescribed more pain relievers.

After her visit of January 30, Lutz did not return to Dr. Coy for more than a year. She testified that she returned in May 1982 be-

cause of a numbness in her left-hand third finger and left foot. Dr. Coy's evaluation continued to show cervicodorsal myospasm. He referred her to the hospital for physical therapy. Lutz received heat pack treatments and ultrasound on three different occasions. She had further consultations with Dr. Coy in August, October, and December 1982, once for an injured foot unrelated to the instant traffic accident.

After his visit of January 30, 1981, Lane also went a year without treatment. He returned in February 1982, at which time Dr. Coy prescribed cortisone tablets to relieve muscle inflammation. Another visit followed in June 1982.

Lutz and Lane received additional X rays in July 1982 at the direction of Dr. Coy. Dr. Mina Edelman, a nontreating, board certified radiologist, took the X rays. At trial, she interpreted the several series of X rays taken of both patients. Regarding Lutz, Dr. Edelman testified that the loss of the lordotic curve was caused by muscle spasms, which was consistent with her injury resulting from the accident. Dr. Edelman offered her opinion that muscle spasm was still present. She further testified about her observation of an offset or slippage of the fourth and fifth cervical vertebrae and that the significance of that in this case was that it was indicative of torn ligaments between the spinous processes. Dr. Edelman opined that the forward slippage condition was permanent and that the only surgical correction available to Lutz is a spinal fusion. The radiologist concluded that Lutz's complaints of pain in her shoulder area are consistent with her radiographic findings.

Regarding Lane, Dr. Edelman testified that, in her opinion, he had suffered loss of the lordotic curve, which she attributed to muscle spasm caused by trauma. It was also her opinion that the accident could have caused the observed condition.

Following each of the plaintiffs' numerous consultations with Dr. Coy, each sought chiropractic care from Dr. James D. Cooper. From November 30, 1982, and from December 17, 1982, respectively, Lane and Lutz each received over 40 chiropractic treatments through October 11, 1983, almost all of which were scheduled on the same dates for both plaintiffs. Dr. Cooper's testimony represents the greatest amount of expert testimony upon which plaintiffs rely.

Dr. Cooper, a chiropractor of two years' experience, testified extensively about Carol Lutz's and Thomas Lane's complaints, symptoms, treatments and prognoses.

Regarding Lutz, he found pinching pain and occasional numbness in her upper left shoulder area; neck tenderness upon palpation; stiff-

ness between the shoulder blades and mid-back; pain in the dorsal spine; weakness in both sternoclavicular areas, the latissimus dorsi, the left pectoralis major, the teres major and both trapezius muscles; and spasm along the spine with nerve irritation. Upon examination of her X rays, Dr. Cooper testified that he found indications which corresponded with the areas of pain in the upper dorsal region of which Lutz complained. The second set of films revealed a loss of mobility between the vertebrae in the neck and what he termed excessive mobility between vertebrae, this being, in his opinion, compatible with a whiplash injury which the patient told him occurred on November 11, 1980. Dr. Cooper further testified that a "large degree of tilting" at the first dorsal vertebra was directly related to the accident in question. He testified that Lutz suffered from nerve inflammation between the left ribs and irritation and abnormal mobility and subluxation of the C-5, C-6, T-1, T-2, T-3, and T-4 vertebrae. He further stated that she sustained neck ligament damage and nerve damage, giving rise to recurrent pain of the left upper dorsal spine and spasm of the left erector spinae muscles. Dr. Cooper found it "difficult to say" whether Lutz's condition upon her last visit was permanent, but he did say there was a strong possibility that she will have continued aggravation in her left shoulder area "from time to time."

With regard to Lane's condition, Dr. Cooper testified that he performed comprehensive testing upon his examination because Lane complained of pain in his lower back which radiated to his shoulders and was sometimes accompanied by a heat sensation in a band of muscles around his waist. Lane also had pain in his neck and tingling in fingers of the left hand. Dr. Cooper testified that he found muscle weakness in the left pectoralis major, both sternoclavicular areas and the area along the front of the neck; lumbar pain; and compressed nerves emanating from the neck. Dr. Cooper indicated that the spinal segments affected by the accident were the fifth and sixth cervical vertebrae, the first, fourth, fifth, eighth, ninth, eleventh and twelfth dorsal vertebrae and the first and fifth lumbar vertebrae. Upon examination of his X rays, Dr. Cooper testified that they revealed abnormal straightening of the cervical curve, which he stated was a positive finding significant to whiplash injuries. He also detected loss of spinal mobility and a jamming of the vertebral joint surfaces. He diagnosed spinal injury and neurological abnormalities as a result of the accident in question.

Dr. Cooper presented testimony and evidence of charges regarding his treatment and care of each plaintiff. Mr. Lane's treatment included heat packs, manipulation, electrical muscle stimulation and ul-

trasound. He testified that continued chiropractic treatment for Mr. lane is "of the utmost necessity." Ms. Lutz's treatment included manipulation, ultrasound, electrical muscle stimulation, physical therapy and mobilization on a spinalator. Dr. Cooper testified that she should continue treatments for at least six months.

Dr. Herbert E. Rosenbaum, a neurologist of 30 years' experience and professor of clinical neurology at Washington University School of Medicine, testified for the defense. At the request of defendant's attorney, Dr. Rosenbaum gave Lane a complete neurological examination in March 1983, about which he testified extensively. He did not personally evaluate Lutz. His testimony consists primarily of radiologic assessments concerning the series of X rays taken of both plaintiffs. A large portion of his testimony also includes results of various neurological testing performed on Mr. Lane. Dr. Rosenbaum's testimony comprises 80 pages of the trial transcript, parts of which are summarized below.

Regarding his examination of Ms. Lutz's X rays, Dr. Rosenbaum testified that he observed a straightening of the lordotic curve of the cervical spine with a little subluxation or a dislocation of uncertain origin of one vertebra upon another. He opined that the accident in question could not have caused this condition. He found nothing particularly consequential regarding her neuroforamena and found no particular significance in the fact that Lutz had persistent loss of the lordotic curve throughout her series of X rays. He testified that he did not see any outstanding pathology on her sets of X rays.

Regarding Mr. Lane, Dr. Rosenbaum testified that the X ray taken on the evening of the accident in question showed some straightening of the lordotic curve but that, in general, it looked very normal. He did not find anything out of the ordinary and noted no arthritis. Dr. Rosenbaum testified that he observed no substantial differences in the X rays taken two years apart. He observed what he thought might be a congenital abnormality of the lumbar spine but no other abnormalities there. He observed good extension and good flexion of the neck, with no associated muscle spasm. Dr. Rosenbaum could not foresee permanent injury to Lane's neck. He testified that from a neurologic standpoint, it appeared to him that there was nothing to prevent Lane from performing manual labor.

A great deal of other testimony regarding personal injuries and pre- and post-occurrence activities came from the plaintiffs themselves. Both plaintiffs described many incidences evidencing their mobility and freedom from pain before the accident and compared them with their current states of health, which they would have had the

jury believe were severely affected by the accident. Both plaintiffs claimed compensation for damages which allegedly hindered and prevented them from attending their usual duties and affairs. In addition, Lane made claim for a loss of earning capacity. Medical, hospital and chiropractic expenses amounted to $2,063.82 for Lane and $1,770.42 for Lutz. The jury assessed compensable damages in the sum of $1,920 for Lane and $1,428 for Lutz.

As noted at the outset, plaintiffs question only the adequacy of the amounts of damages awarded. They argue that the amounts of damages as reflected in the verdicts rendered are palpably inadequate and bear no relationship to their losses sustained. They contend that the amount of each verdict is the result of error or prejudice, that the verdicts are against the manifest weight of the evidence, and that the jury failed in each case to properly weigh and consider the evidence and follow the instructions. To sustain these arguments, plaintiffs cite as authority numerous cases concerned with verdicts considered insufficient as a matter of law and cases concerned with jury passion, prejudice and disregard of instruction resulting in verdicts against the manifest weight of the evidence. We have reviewed those cases cited but find more persuasive the cases and rationale following.

The rules applicable to consideration on appeal of the issue as to whether the trial court erred in refusing to grant a new trial by reason of the inadequacy of the jury verdict are set forth in illustrative cases such as *Potter v. Rodrock* (1979), 77 Ill. App. 3d 7, 395 N.E.2d 746, *Ford v. Baker* (1978), 61 Ill. App. 3d 45, 377 N.E.2d 853, and *Haleem v. Onate* (1966), 71 Ill. App. 2d 457, 219 N.E.2d 94, where the court discussed the variables which enter into a review of the record as a whole to determine the adequacy of an award of damages. As in *Ford*, the plaintiffs here have not argued that the jury was improperly instructed.

> "When the jury has been properly instructed, both trial and reviewing courts are reluctant to set aside the amount of the jury verdict. (*McManus v. Feist* (1966), 76 Ill. App. 2d 99, 221 N.E.2d 418.) Both courts are well aware that many factors, including credibility of the witnesses, are considered by the jury in reaching its verdict. However, when the jury renders a verdict and the amount of damages is palpably inadequate, justice requires that that verdict be set aside and a new trial ordered. *Kelley v. Cross* (1967), 79 Ill. App. 2d 342, 223 N.E.2d 555; *Ryan v. Hoffman* (1972), 7 Ill. App. 3d 621, 288 N.E.2d 255; *Haleem v. Onate* (1966), 71 Ill. App. 2d 457, 219 N.E.2d 94."
>
> *Ford v. Baker* (1978), 61 Ill. App. 3d 45, 46-47, 377 N.E.2d

853, 854.

■ Further, in order to determine whether the jury verdicts on the amounts of damages are inadequate in the instant case, we must consider the record as a whole, for the only basis for determining whether damages are palpably or obviously inadequate is the exercise of sound judgment. As the granting of a motion for a new trial is a matter of discretion for the trial court, we will not reverse the trial court's ruling unless we find an abuse of discretion, that is, unless we find no reasonable basis in the evidence to support the ruling of the trial court.

■ Contrary to what plaintiffs argue, they are not entitled, as a matter of right, to automatic compensation for the amount of special damages or out-of-pocket expenses claimed. As stated in *Haleem*, special damages often may be a useful measure, but they need not be an incontestable basis for the determination of a proper award. Mathematical computations represent only a part of the total evidence.

"There are other evidentiary matters to be considered. The testimony surrounding the claimed injuries may have been impeached or it may be contradictory or unreliable. There may be evidence which carries an implication that the injuries have been exaggerated or even feigned or that the medical treatment was either unnecessary or prolonged. There may be evidence which makes doubtful the necessity of the time alleged to have been missed from work. All of these and like factors must be weighed. And if there appears to be evidence suggesting a genuine conflict as to the legitimacy of the expenses incurred, then the verdict of the jury should not be disturbed on review. The jury has the function of determining the credibility of witnesses and the weight to be given their testimony. It is usually instructed to consider all of the evidence in the light of its own experience in the affairs of life. This prerogative should not be withdrawn from the jury if there is any evidence tending to support its conclusion as to the amount of damages actually sustained. Thus this court has said that it will affirm verdicts, however low, which are sustained by evidence or the absence of particular evidence. Daly v. Vinci, 51 Ill. App. 2d 372, at 386, 201 N.E.2d 200, at 207 (1964). In Jeffrey v. Chicago Transit Authority, 37 Ill. App. 2d 327, 185 N.E.2d 384 (1962), a rearend collision case, we affirmed a verdict of no damages where the plaintiffs' testimony was impeached and self-contradictory and the testimony of the treating physician could have been deemed unworthy of belief." *Haleem v. Onate* (1966), 71 Ill.

App. 2d 457, 461, 219 N.E.2d 94, 96.

As pointed out in appellants' brief, by its verdicts the jury acknowledged that plaintiffs received some injuries, and it seems beyond dispute that some injuries resulted from the accident of November 11, 1980. The extent of those injuries, however, was a matter for the jury to determine. The jury was entitled to weigh the credibility and general demeanor of the plaintiffs, including their subjective manifestations of pain, something which the record does not permit this court to evaluate. The jury was aware that the only immediate complaint came from Lutz, who suffered a bump on the head. The jury was also aware of the timing and extent of the medical and chiropractic treatments and the fact that both plaintiffs began treatments with Dr. Cooper nearly two years after the accident but within six months following their discovery depositions. Dr. Coy also made it clear that he never referred Lutz or Lane to a chiropractor and that he did not restrict either's activities after the initial onset of injuries. The jury was further entitled to weigh the significance of each plaintiff's one-year period of nontreatment after January 30, 1981. Also, it may have been significant to the jury that Lane had a prior history of back pain.

We do not agree that plaintiffs' proof of damages stands entirely unrebutted or uncontested. Dr. Edelman testified on cross-examination that Lutz's subluxation could have predated the accident. Dr. Coy admitted that he had no prior X rays with which to compare her lordotic curve as it appeared before the accident. Dr. Rosenbaum opined that Lutz's subluxation could have existed all of her life and that it was not reasonably possible that the impact of the accident caused it. Dr. Coy found no neurologic deficit of any kind regarding Mr. Lane, nor any muscle atrophy. He had no record of complaints of low back pain. Dr. Coy testified that Lane's anterior wedging of the C-5 vertebra pre-existed the accident. He also stated that after January 30, 1981, Lane was capable of engaging in work-related activities and that there was no indication at that time that Lane would not make a full recovery from any soft tissue injury that he may have suffered. Dr. Rosenbaum concluded that there was no objective reason why Lane could not perform manual labor if he wanted to. He further testified that he attached no particular significance to Lutz's nor Lane's loss of lordotic curve under the circumstances as presented to him.

Moreover, the jury was entitled to weigh the evidence regarding the severity of the impact, including Officer Stygar's characterization as a "routine-type accident" and the defendant's testimony that he repaired his car at a cost of about $45.

■ Finally, the jury heard testimony regarding the plaintiffs' post-occurrence activities. Lutz's various activities included cutting and loading wood during the spring of 1981 and assisting her father in constructing a house. Lane's various activities included taking care of his own personal needs, climbing stairs and plowing his fields. Although plaintiffs testified that they suffered pain while performing these various activities, the jury was entitled to weigh the import of their testimony.

In light of this foregoing summary of conflicting evidence in the face of plaintiffs' affirmative evidence of damages, we find that there exists a reasonable basis for the jury's award of damages and the trial court's denial of a motion for a new trial based on the alleged inadequacy of damages. We find that there is some evidence that carries an implication of exaggerated or even feigned injuries and that certain medical and chiropractic treatments were either unnecessary or prolonged. We find there is evidence tending to impeach, contradict or make unreliable some of the claimed injuries. We further find there is also evidence tending to make doubtful Lane's claim regarding his inability to work and evidence that he was unable to find employment or had no employment. In short, the record, considered as a whole, presents evidence of a general conflict of the legitimacy of the expenses incurred and the damages claimed. This being the case, we will not disturb the jury's finding, and we find no abuse of discretion in the trial court's denial of a new trial.

For all of the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

KASSERMAN and HARRISON, JJ., concur.