ANNETTE BUTTITA, Plaintiff-Appellant, v. PATRICIA STENBERG, Defendant-Appellee.

First District (1st Division)   No. 1—91—3204

Opinion filed May 3, 1993.

Dominic R. Fichera & Associates, of Chicago (Michael G. Miller, of counsel), for appellant.

Landau, Omahana & Kopka, Ltd., of Chicago (Robert J. Kopka and Barry A. Robin, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff Annette Buttita filed this negligence action as a result of personal injuries she sustained in a March 4, 1985, rear-end motor vehicle collision with defendant Patricia Stenberg. Following a jury trial, the jury awarded plaintiff $4,000 for the "reasonable expense of necessary medical care," $1,000 for lost wages but $0 for the "pain and suffering experienced."

Plaintiff subsequently moved for a new trial on the issue of damages only, contending that it was irreconcilably inconsistent for the jury to award pain-related expenses as part of the medical expense award but nothing for pain and suffering. Plaintiff appeals the circuit court's denial of her new trial motion.

Plaintiff testified that prior to the accident, she experienced no serious medical problems such as headaches or numbness in her arms and legs. Ill health never required her to miss work during her last 15 years of full-time work. Plaintiff was active and participated in athletics. She was about 40 years old at the time of the accident.

On March 4, 1985, plaintiff was on her way to work in the morning when she stopped at a traffic light to make a left turn. While stopped, defendant rear-ended her vehicle. The impact caused the bumper of her car to be pushed under the body, produced a crease in the left rear side panel and cracked a battery post. Plaintiff's car was towed to a service station.

Defendant would later testify that, after stopping behind plaintiff, she proceeded forward a short distance when her car "tapped" plaintiff's vehicle in the rear. Defendant's four-year-old daughter, seated in the front seat, was not disturbed whatsoever by the collision. Defendant was fine too. Plaintiff was crying and not unconscious. The impact did not cause plaintiff's car to move forward.

Defendant estimated her speed at the time of impact to be one to three miles per hour, which did not even register on her speedometer. Defendant noticed no damage to either car; she later discovered a hairline crack in her car's grill. Village of Norridge police officer Michael Liacioni would later testify that the damage to the vehicles was under $250.

Substantial amounts of time at trial were spent relative to the nature and extent of plaintiff's injuries as a result of the accident. Plaintiff testified that, following impact, she blacked out and awoke to see the paramedics. Plaintiff told them that her neck was burning and her vision was blurry. Plaintiff was given a neck collar and placed on a backboard. She developed a pounding headache. An ambulance transported plaintiff to Resurrection Hospital.

At the emergency room, plaintiff was examined by an emergency room physician; X rays were ordered. Plaintiff had pain in her head, neck and ribs, and she was badly bruised. Plaintiff was told her sixth rib was broken. Plaintiff received a rib belt, a sling for her left arm and a prescription for pain medication. Plaintiff remained in the hospital the entire day but was not admitted. She was told to follow up with her own physician.

At home, plaintiff's pains continued despite the taking of pain medication. Over the next few days, plaintiff felt worse, and numbness in her arms and legs developed.

On March 11, 1985, she sought the services of her physician, Dr. Raymond McDonald. Plaintiff was still wearing the rib belt and arm sling and taking her pain medication. McDonald conducted an examination and, on the belief she had a concussion, admitted plaintiff that afternoon into Westlake Community Hospital

Plaintiff stayed at Westlake for two weeks. She was fully examined by Dr. McDonald and Dr. Akkeron, an orthopedic surgeon. The examination included X rays and diagnostic tests. Plaintiff received physical therapy twice a day and traction for large portions of the day. The physical therapy consisted of hot packs, ultrasound and other forms of traction.

Plaintiff was not feeling better when she was discharged from the hospital, and she did not return to work. She was told to continue physical therapy at Westlake which she did every day for a month. The physical therapy routine was later reduced to three days a week, then two days a week. She continued to experience headaches, but the physical therapy helped them subside. Plaintiff wore the rib belt for a total of six weeks, the sling for a few months and the neck collar all the time except at night when she went to sleep.

Plaintiff continued to see Dr. McDonald on a monthly basis and Dr. Akkeron every few months. Two months following the accident, plaintiff described her symptoms as follows: she was still experiencing shooting pains down her spine, pains in the back of her head and numbness in her arms and legs.

In September 1985, Dr. McDonald recommended the services of a neurosurgeon, Dr. Belisario Arias. Plaintiff was scared about surgery and did not keep her appointment. Plaintiff's symptoms mostly subsided, and she stopped seeing Dr. McDonald in early 1986.

In March 1988, about three years following the accident, plaintiff returned to Dr. McDonald when her pain and numbness in her arms and legs became worse; plaintiff knew she had a problem. Plaintiff received various tests and was recommended to see Dr. Arias, the neurosurgeon.

In May 1988, Dr. Arias recommended that plaintiff undergo a laminectomy, which plaintiff did in August 1988 at Westlake Hospital. Plaintiff was in an extreme amount of pain during her two-week hospital stay. She participated in physical therapy every day and wore a neck collar to prevent her head from falling to the side. Pain killers did not seem to ease the pain, which lasted for months.

After her release, plaintiff continued therapy every day at the hospital and took her pain medication. She also used a "TENS" unit, which relaxes muscles electrically, to help her with the pain. Plaintiff used this machine until 1990 and had begun using it again in July 1991, the time of trial.

Plaintiff testified that her pain was mostly gone except that she still suffered from stiffness in her neck and hip and has problems swallowing. The weather affects her condition. Plaintiff no longer participates in athletics and has never returned to work or driven an automobile.

Plaintiff also had carpal tunnel (wrist) surgery in January 1989, almost four years following the accident. Plaintiff sought compensation for this surgery as well.

Dr. Raymond McDonald testified that plaintiff came to his office in March 1985 complaining of headaches, neck pain and radiation of that pain into her arms. McDonald detected muscle spasms and diagnosed plaintiff as having a post-concussive headache with cervical radiculapathy. Cervical radiculapathy involves a shooting type of pain from the cervical area of the spine.

McDonald admitted plaintiff into Westlake Community Hospital, where she stayed for about 10 days. Plaintiff's treatment at Westlake included the matters stated during her direct examination. Plaintiff

was not feeling as well as McDonald had hoped when he released her from the hospital.

McDonald saw plaintiff in 1985 on April 1, April 8, April 22, July 17 and October 2, and October 30. Plaintiff complained of neck and back pain and arm numbness on these occasions. McDonald prescribed various treatments, including physical therapy, TENS and ultrasound. Plaintiff's pain continued despite his various treatments.

McDonald continued to see plaintiff in early 1986. Plaintiff's complaints were basically the same. McDonald believed they were getting "nowhere fast." McDonald recommended that plaintiff undergo an electromyogram (EMG), which measures nerve conduction down the arms. The results were normal. A "CAT" scan also came back negative.

McDonald reviewed an X ray of plaintiff taken the day of the accident in the emergency room. It revealed some degenerative arthritic changes of the cervical spine, principally caused by aging. Osteophytes or bone spurs, which are calcium deposits on the vertebrae of the spine, were not present.

McDonald had Dr. Akkeron conduct a magnetic resonance imaging test (MRI) in May 1986. This test revealed osteophytes and diminution of the aperture openings around the nerve roots. These conditions developed over time, demonstrating plaintiff's propensity toward degenerative disease.

McDonald believed that the surgery did plaintiff some good; however, she still experienced some pain. McDonald continued to see plaintiff until September 1988. Plaintiff told him of surgery-related pains.

McDonald described plaintiff as high strung, nervous, and fidgety, with a dependent personality. McDonald nevertheless believed that plaintiff's complaints of pain were very real.

McDonald opined that plaintiff's carpal tunnel surgery had nothing to do with the automobile accident. He further believed that plaintiff did not have osteophytes before the accident and that the accident aggravated the arthritic condition in her spine.

Dr. Alfred Akkeron, an orthopedic surgeon, testified that he first saw plaintiff on March 15, 1985, at Westlake Hospital. Dr. McDonald called Dr. Akkeron as a consultant.

While plaintiff was in the hospital, Akkeron conducted various tests. Akerron could make objective findings, such as restricted leg movements, but no objective neurologic basis existed to support these findings. Akkeron believed that plaintiff may have a ruptured cervical disk. Akerron ordered a CAT scan of the cervical spine and an EMG.

Both of these tests are objective neurologic tests. The results were negative. Akkeron recommended that plaintiff see Dr. Arias, but plaintiff did not keep that appointment because of her fear that she may need surgery.

Akkeron next saw plaintiff on March 22, 1988. Plaintiff complained of pain in her left upper extremity, numbness and tingling in the right upper extremity and a decreased range of neck motion. Plaintiff's symptoms were basically the same as those which Dr. Akkeron observed in 1985. Akkeron recommended that plaintiff undergo an MRI. The MRI showed plaintiff to have spondylosis, a degenerative spinal condition, with osteophytes at C4-C5 and C5-C6, which impinged on the spinal cord. Plaintiff was again referred to Dr. Arias.

Akkeron opined that the rear-end collision aggravated plaintiff's condition and that plaintiff has a permanent problem. A significant amount of force would not be required to cause an aggravation.

Dr. Belisario Arias, a neurosurgeon, testified by way of evidence deposition that he saw plaintiff on May 12, 1988, to determine if she was a candidate for surgery. After plaintiff related her medical problems to Dr. Arias, he conducted a neurological examination. The results were "grossly normal." However, based on plaintiff's 1988 MRI, Arias diagnosed plaintiff as having cervical spondylosis, a disk disease that produces degeneration in the disk spaces of the spine. This condition could be caused by trauma, could develop over time and may be objectively asymptomatic in a neurologic sense. It is most usually associated with the aging process. Plaintiff also had osteophytes which impinged on her spinal chord. These develop over months or years and are associated with the condition spondylosis.

Plaintiff saw Dr. Arias again in August 1988; her condition had worsened. Arias performed objective neurological tests upon plaintiff to detect spinal problems; positive results were obtained. Arias recommended that plaintiff receive a laminectomy, which plaintiff did in August 1988. Two of plaintiff's disk were removed during this surgery as well as her osteophytes. Arias believed plaintiff responded properly to the operation, but experienced a little more pain than most people because she was an emotional person.

Dr. Arias opined that the condition he observed in 1988 was caused by a trauma occurring near the time of the automobile accident. He admitted, however, that plaintiff's spondylosis could have been caused by natural aging and been present before the accident.

Arias reviewed emergency room X rays of plaintiff taken March 4, 1985. Another doctor's report of this X ray revealed that plaintiff

had straightening of the cervical spine, early degenerative changes at the level of C4-C5 and C5-C6, with slight disk space narrowing and anterior and posterior osteopathic formation. Arias believed the X rays were of poor quality; he could make no diagnosis from these X rays.

Dr. Arias also reviewed cervical spine X rays taken March 13, 1985. He saw C5-C6 narrowing and straightening of the cervical spine. The presence of osteophytes could not be accurately assessed from the X rays viewed. The narrowing was possibly present before the accident.

Plaintiff received her wrist surgery in December 1988. The wrist injury "could have or might have" been related to the car accident.

Plaintiff presented a total of $30,128.77 in medical bills to the jury. These bills, however, were only published to the jury in summary fashion. Relevant to this appeal are the following figures in the summary:

> Dr. Raymond McDonald ....................$ 1,800.00
> Diagnostic Radiology Assoc. Ltd. ............$     45.00
> Westlake Community Hospital ...............$18,780.90
> Resurrection Hospital ......................$   299.50
> Dr. Belisario Arias ........................$ 5,405.00

Plaintiff rested.

Defendant presented Dr. Hilliard Slavick, a neurologist, and Dr. Robert Hall, an orthopedic surgeon, who testified based upon their review of plaintiff's medical records. Neither personally examined plaintiff.

Slavick testified that the X rays dated March 4, 1985, showed osteophytes at C4-C5 and C5-C6 and disk space narrowing. This condition predated the accident and took a while, at least six months, to develop. Plaintiff's March 13, 1985, X rays revealed similar spurring and narrowing. Slavick showed the jury what he believed to be the osteophytes on the X rays. They were not attributable to the automobile accident. Slavick also reviewed plaintiff's 1985 CAT scan. It showed spurring at C4-C5 and C5-C6; no spurring at other levels of the spine was present.

Slavick opined that plaintiff's laminectomy in August 1988 was not related to the automobile accident. While plaintiff had subjective complaints of pain immediately following the accident, no objective neurologic basis existed to support them. Slavick further opined that the automobile accident did not aggravate plaintiff's preexisting condition.

Slavick testified that no organic reasons existed to explain plaintiff's constant complaints of pain. These complaints were not due to

organic structural processes, but rather to psychological factors or secondary gain. Slavick relied in part on plaintiff's 1985 EMG, which demonstrated no nerve abnormalities.

Slavick believed that plaintiff's carpal tunnel surgery in her right wrist was not related in any way to the accident. Plaintiff's symptoms up until her laminectomy did not reveal compression on the median nerve, and an EMG performed in December 1988 was the first objective indication of a problem with her wrist. Plaintiff's complaints of wrist pain began about this time. If the accident caused plaintiff's carpal tunnel syndome, she would have then sustained noticeable trauma to the wrist area. Plaintiff's emergency room records revealed no such trauma.

The testimony of Dr. Robert Hall, an orthopedic surgeon, paralleled Slavick's. In particular, plaintiff had spondylosis at the time of the accident, which had already produced disk space narrowing and mild osteophytes. The accident did not aggravate this condition. Plaintiff's wrist surgery was not related to the accident. The constant and worsening pain plaintiff suffered in her neck was due to her spondylosis, not the automobile accident.

At the close of the evidence, the jury was instructed in part as follows:

> "If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate her for any of the following elements of damages proved by the evidence to have resulted from the negligence of the defendant taking into consideration the nature, extent and duration of the injury.
>
> These are the elements: The aggravation of any pre-existing ailment or condition, the disability and disfigurement resulting from the injury, the pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injury, the reasonable expense of necessary medical care, treatment and services received, the value of earnings lost.
>
> Whether any of these elements of damages has been proved by the evidence is for you to determine."

Relying on *Hinnen v. Burnett* (1986), 144 Ill. App. 3d 1038, 495 N.E.2d 141, and the cases following it (see *Healy v. Bearco Management, Inc.* (1991), 216 Ill. App. 3d 945, 576 N.E.2d 1195, *appeal denied* (1991), 142 Ill. 2d 654, 584 N.E.2d 129; *Rice v. Merchants National Bank* (1991), 213 Ill. App. 3d 790, 572 N.E.2d 439, *appeal denied* (1991), 141 Ill. 2d 559, 580 N.E.2d 133; *Kumorek v. Moyers* (1990), 203 Ill. App. 3d 908, 561 N.E.2d 212), plaintiff asserts that the

jury's award of pain-related expenses as part of its medical expense award is irreconcilably inconsistent with the jury's failure to award pain and suffering and demonstrates that the jury ignored a proven element of damages.

In *Hinnen*, plaintiff Hinnen filed an action to recover damages for personal injuries sustained when defendant's pickup truck struck the rear of her automobile. The collision caused negligible damage to the parties' vehicles. Defendant admitted liability, but attacked the nature and extent of plaintiff's injuries. Like in the instant case, the evidence on these matters conflicted.

Following a jury trial, plaintiff was awarded $2,500 for *all* her past medical expenses, but nothing for pain and suffering. Plaintiff moved for a new trial, contending that the verdict was inadequate in that she should have received damages for lost wages, pain and suffering and disability.

On review, the appellate court initially rejected plaintiff's argument that she should have received an award for lost wages. Reviewing the evidence, the court found "a genuine conflict as to the legitimacy of plaintiff's claim for lost wages. Her assertion that she could not go to her job while undergoing physical therapy was completely uncorroborated." *Hinnen*, 144 Ill. App. 3d at 1044.

The court next rejected plaintiff's argument that she should have been awarded pain and suffering damages. The court was persuaded by the evidence that the collision, which occurred on a Friday, caused minor damage; that plaintiff was able to complete her errands following the accident and return to work (which required plaintiff to lift, move and operate a fork lift) for four nine-hour days the following week; that all of plaintiff's medical treatment was based on subjective complaints; and that plaintiff had been involved in two more accidents prior to trial. In light of the conflicting evidence, "the jury had the right to conclude that the disability and pain and suffering experienced by plaintiff because of the collision with defendant were at most minimal and hence, insufficient to require or support an economic evaluation thereof." *Hinnen*, 144 Ill. App. 3d at 1045-46.

Next, the court addressed whether plaintiff was entitled to a new trial because the jury awarded her pain-related expenses, but awarded nothing for pain and suffering. The court stated:

"[A]lthough the jury awarded nothing for pain and suffering, it did compensate plaintiff for the full amount of her expenses for pain medication and physical therapy. To this extent, the verdict is irreconcilably inconsistent. If the jury believed that plaintiff had no compensable pain and suffering, its award of

pain-related expenses was wholly unwarranted and contrary to the manifest weight of the evidence. Conversely, if it believed that plaintiff's pain and suffering were sufficiently serious to warrant expenditures for pain medication and physical therapy, its failure to award her compensation for that pain and suffering means that it disregarded a proven element of damages.

A similar inconsistency appears in *Williams v. McCallister* (1978), 60 Ill. App. 3d 635, 376 N.E.2d 1093, where the plaintiff in an automobile 'whiplash' case was awarded only the expenses for her medical treatment, which included injections for pain and physical therapy, and received nothing for pain and suffering. (See also *Ford v. Baker* (1978), 61 Ill. App. 3d 45, 377 N.E.2d 853; *Bledsoe v. Amiel* (1978), 57 Ill. App. 3d 54, 372 N.E.2d 1033; *Giddings v. Wyman* (1961), 32 Ill. App. 2d 220, 177 N.E.2d 641.) There, however, the question of the verdict's inconsistency was never addressed by the court. We are aware of no case in which such an inconsistency has been directly sanctioned. To the contrary, our supreme court has recently held that where verdicts are returned in the same action which are legally inconsistent, the verdicts should be set aside and a new trial granted. *Wottowa Insurance Agency, Inc. v. Bock* (1984), 104 Ill. 2d 311, 316, 472 N.E.2d 411, 413." *Hinnen*, 144 Ill. App. 3d at 1046.

The dissenting opinion in *Hinnen* disagreed with the majority's conclusion that plaintiff was entitled to a new trial because of the existence of an irreconcilable conflict in the jury's verdict. The dissent noted that many cases existed which "sanction an award of damages for pain medication and treatment but no award of damages for pain and suffering." (*Hinnen*, 144 Ill. App. 3d at 1047 (Jones, J., dissenting).) Such cases included, among others, *Williams, Ford, Bledsoe* and *Giddings*, which the majority opinion had cited. The dissent found these cases "fully viable on the point" even though they did not discuss the jury's verdict in terms of an "inherent inconsistency." *Hinnen*, 144 Ill. App. 3d at 1047 (Jones, J., dissenting).

The dissent also believed that, in general, a reviewing court need only resort to the evidence presented at trial to better explain why a jury awarded pain-related expenses but denied pain and suffering. In support, the dissent quoted an earlier appellate court opinion:

" 'There are other evidentiary matters to be considered. The testimony surrounding the claimed injuries may have been impeached or it may be contradictory or unreliable. There may be evidence which carries an implication that the injuries have

been exaggerated or even feigned or that the medical treatment was either unnecessary or prolonged. There may be evidence which makes doubtful the necessity of the time alleged to have been missed from work. All of these and like factors must be weighed. And if there appears to be evidence suggesting a genuine conflict as to the legitimacy of the expenses incurred, then the verdict of the jury should not be disturbed on review. The jury has the function of determining the credibility of witnesses and the weight to be given their testimony. It is usually instructed to consider all of the evidence in the light of its own experience in the affairs of life. This prerogative should not be withdrawn from the jury if there is any evidence tending to support its conclusion as to the amount of damages actually sustained. Thus this court has said that it will affirm verdicts, however low, which are sustained by evidence or the absence of particular evidence. *Daly v. Vinci*, 51 Ill. App. 2d 372, at 386, 201 N.E.2d 200, at 207 (1964). In *Jeffrey v. Chicago Transit Authority*, 37 Ill. App. 2d 327, 185 N.E.2d 384 (1962), a rear-end collision case, we affirmed a verdict of no damages where the plaintiffs' testimony was impeached and self-contradictory and the testimony of the treating physician could have been deemed unworthy of belief.' " *Hinnen*, 144 Ill. App. 3d at 1048 (Jones, J., dissenting), quoting *Haleem v. Onate* (1966), 71 Ill. App. 2d 457, 461, 219 N.E.2d 94, 96.

Initially, we find plaintiff's reliance on *Hinnen* and its progeny misplaced as that line of cases contains an important factual predicate not present in this case. In the *Hinnen* cases, the jury awarded the plaintiff *all* of the medical expenses incurred which, on the records there presented, included pain-related expenditures.

■■ Here, plaintiff did not receive *all* her medical expenses claimed, nor can we say with sufficient certainty that the $4,000 awarded included pain-related expenses. Regarding how the jury came to the $4,000 figure, plaintiff directs this court to the following bills: $299 for Resurrection Hospital (emergency room); $45 for Diagnostic Radiology Associates Ltd. (emergency room X rays); and $3,542 for Westlake Community Hospital (March 13, 1985, through March 23, 1985). These bills total $3,886.50. Plaintiff asserts that the $4,000 figure generally represents the medical expenses which she incurred the first two weeks following the accident.

Plaintiff's argument is unpersuasive. The summary provided to the jury relative to Westlake listed a figure of $18,780.90, not $3,542. The higher figure represented plaintiff's *total* bill. Further, plaintiff's

theory does not include expenses for the treatment which she admittedly received from Drs. McDonald and Akkeron. Like the figure in the summary for Westlake, the jury saw only a *total* bill of $1,800 for Dr. McDonald.

It is thus clear that a factual requisite of *Hinnen*—that pain-related expenses be in fact awarded—is missing from this case. Here, we cannot say with sufficient certainty whether the jury's medical expense award included pain-related expenses. The $4,000 figure could be the jury's estimation of plaintiff's non-pain-related medical bills. This would be consistent with the jury's failure to award any pain and suffering. This too, however, is speculation; no one knows for sure what the jury did.

The facts of this case are not unlike those presented in *Griffin v. Rogers* (1988), 177 Ill. App. 3d 690, 532 N.E.2d 591. There, plaintiff sought recovery for injuries suffered in a minor automobile collision. The jury awarded plaintiff $365 as the present cash value of reasonable medical expenses but gave her nothing for pain and suffering. Plaintiff appealed, arguing that an inconsistency in the verdict existed. The court disagreed, finding that, in the face of an uncertain record, no conclusive determination could be made that the $365 figure included pain-related expenses. (*Griffin*, 177 Ill. App. 3d at 694-95.) Like *Griffin*, we can make no "conclusive determination" that the jury's $4,000 award included compensation for plaintiff's pain-related medical expenses.

Although we could affirm the circuit court denial of plaintiff's new trial motion based on the foregoing, we believe it necessary to question the soundness of *Hinnen* to the extent it holds that a jury verdict *must* be set aside as irreconcilably inconsistent when, on the one hand, pain-related expenses are included within a medical expense award, but monies for pain and suffering are denied on the other. In particular, we take issue with the following passage:

> "If the jury believed that plaintiff had no compensable pain and suffering, its award of pain-related expenses was wholly unwarranted and contrary to the manifest weight of the evidence. Conversely, if it believed that plaintiff's pain and suffering were sufficiently serious to warrant expenditures for pain medication and physical therapy, its failure to award her compensation for that pain and suffering means that it disregarded a proven element of damages." *Hinnen*, 144 Ill. App. 3d at 1046.

We believe the dissent in *Hinnen* properly took issue with the above passage. The dissent's treatment of the issue is more consistent

with long held standards of appellate review relative to damage awards. These standards have been generally stated as follows:

"The issue of damages is particularly within the discretion of the jury and courts are reluctant to interfere with the jury's exercise of its discretion. [Citation.] A reviewing court may order a new trial if the damages are manifestly inadequate, if it is clear that proved elements of damages have been ignored or if the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff. [Citation.] To determine whether a jury verdict on the amount of damages is inadequate for any of the foregoing reasons, we must consider the record as a whole." (*Chrysler v. Darnell* (1992), 238 Ill. App. 3d 673, 678-79.)

Another court has stated on the issue: "Absent some indication that the jury failed to follow some rule of law, considered some erroneous evidence, or an indication in the record that the verdict was the obvious result of passion or prejudice, we cannot upset that verdict." *Perry v. Storzbach* (1990), 206 Ill. App. 3d 1065, 1069, 565 N.E.2d 211.

■ We believe that the *Hinnen* majority departed from these well-settled principles of review. Where the pain and suffering element of plaintiff's evidence is weak or contested, as is often the case in a rear-end automobile accident case, the jury may merely reject plaintiff's pain and suffering evidence as unpersuasive or decide that a separate pain and suffering award is unjustified. Simultaneously, the jury may decide to compensate the plaintiff for her out-of-pocket medical expenses, including pain-related expenses. In the proper case, there is no inherent inconsistency in such an award. We agree with the *Hinnen* dissent that, where such an award finds justification in the evidence presented and does not violate one of the well-settled principles of review, it should be upheld on review. In short, damages are the jury's prerogative, not the appellate court's.

This case proves the rule. Even if we were to assume that the jury in this case awarded pain-related expenses as part of its medical expense award, the verdict should be affirmed.

At the close of the evidence, plaintiff's counsel requested over $500,000 in damages. This was a minor whiplash case, and the jury's verdict recognized it as such.

The evidence supports the jury's verdict. During trial, the jury heard plaintiff testify that she never drove a car again following the accident and never returned to work. However, no medical evidence supports plaintiff's conduct.

Dr. McDonald, plaintiff's treating physician, described plaintiff as high strung, nervous, and fidgety with a dependent personality. Dr. Arias, plaintiff's neurosurgeon, testified that plaintiff was an emotional person who experienced more pain than would an ordinary patient. Defendant's experts also opined that plaintiff's pain was attributable to secondary factors.

We could detail the evidence further, but this would have limited value. While *Hinnen* would have this court set aside the verdict based on an inherent inconsistency, our review of the evidence leads us to conclude that the jury's verdict is quite accurate.

For the foregoing reasons, we affirm the order of the circuit court denying plaintiff's motion for a new trial. The judgment entered on the jury's verdict is also affirmed.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.